**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

FRED A. P.,[1]
     Plaintiff,

v.                                                                  Civil No. 3:21-cv-378 (MHL)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
     Defendant.

**REPORT AND RECOMMENDATION**

     This is an action seeking review of the decision of the Commissioner ("Commissioner") of

the Social Security Administration ("SSA") denying Plaintiff's application for a period of

disability and disability insurance benefits under the Social Security Act (the "Act"). At the time

of his application date, Plaintiff was fifty-five years old with a high school-level education and a

criminal justice academy certificate. (R. at 156, 238.) Plaintiff previously worked as a chief of

police and a sheriff's deputy. (R. at 178.) Plaintiff alleges he is unable to work due to back and

shoulder pain, arthritis, hypertension, depression, and anxiety. (R. at 177, 215.) On December 21,

2020, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not

disabled. (R. at 12.)

     Plaintiff now seeks review of the ALJ's decision. This matter comes before the Court for

a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of
the United States has recommended that, due to significant privacy concerns in social security
cases, federal courts should refer to claimants only by their first names and last initials.

summary judgment, rendering the matter ripe for review.[2] For the reasons set forth below, this Court recommends that Plaintiff's Motion for Summary Judgment and Motion to Remand (ECF No. 20) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 22 ("Def.'s Mem.")) be GRANTED, and the final decision of the commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on July 12, 2019, alleging disability beginning December 13, 2018. (R. at 156.) The SSA denied Plaintiff's claim on December 27, 2019 (R. at 58-65) and again upon reconsideration on February 10, 2020. (R. at 67-73.) Plaintiff requested a hearing before an ALJ, and a hearing was held on November 3, 2020. (R. at 96, 33-56.) On December 21, 2020, the ALJ issued a written opinion, holding that Plaintiff was not disabled under the Act. (R. at 15-27.) Plaintiff requested a review of the ALJ's decision, and on April 13, 2021, the SSA Appeals Council denied the request, rendering the ALJ's decision as the final decision of the Commissioner (R. at 1-5.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. §§ 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial

---

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In reviewing the decision of the Commissioner based on the record as a whole, the court must consider "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

When making a disability determination, the ALJ must include "adequate rationale and findings" and she must write her decision "so that a clear picture of the case can be obtained. The rationale must . . . show clearly how specific evidence leads to a conclusion." SSR 82–62, 1982

WL 31386 (Jan. 1, 1982); *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017) (explaining an ALJ must "show [their] work"). The ALJ's explanation acts as a "necessary predicate to engaging in substantial evidence review[.]" *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). When an ALJ fails to adequately explain her reasoning, it precludes the "court from undertaking a 'meaningful review.'" *Id*. at 296. If the reviewing court has no way to evaluate the basis of the ALJ's decision, then the "proper course . . . is to remand to the agency for additional investigation or explanation." *Id.* at 295 (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)); *see also Mascio*, 780 F.3d at 637 (finding remand necessary because the court was "left to guess about how the ALJ arrived at his conclusions"). The Court may not "fill in the blanks for the ALJ[,]" nor may the Court "[h]armoniz[e] conflicting evidence," or "bolster[] inconclusive findings" as these activities fall outside the scope of review. *Patterson*, 846 F.3d at 662.

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). At step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity ("RFC")[3], accounting for the most the claimant can do

---

[3] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days

despite his physical and mental limitations. § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform his past work given his RFC. § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 404.1520(e). However, if the claimant cannot perform his past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. §§ 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 15-27.) *See* 20 C.F.R. § 404.1520(a)(4); *Mascio* 780 F.3d at 636. At step one, the ALJ determined that since December 13, 2018 (the alleged onset date), Plaintiff had not engaged in substantial gainful activity.[4] (R. at 17.) At step two, the ALJ determined that Plaintiff's had the following severe impairments: (1) degenerative disc disease; and (2) left shoulder impingement syndrome. (R. at 17.) At step three, the ALJ concluded Plaintiff did not

---

a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

[4] Substantial gainful activity is work that is both substantial and gainful as defined in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

have an impairment, individually or in combination, which met or equaled a disability listing in

20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526). (R. at 19.)

The ALJ then determined Plaintiff's RFC. (R. at 20.) Based on the evidence in the record,

the ALJ determined that Plaintiff retained the ability to perform:

> medium work as defined in 20 C.F.R. § 404.1567(c) except
> frequently stooping and climbing ramps and stairs; occasional[ly]
> climbing ladders, ropes, and scaffolds; frequently
> push[ing]/pull[ing] with the upper and lower extremities; frequently
> reaching in all directions with the left upper extremity; frequent
> exposure to vibrations; and frequent exposure to extreme cold.

(R. at 20.)

The ALJ explained that she determined Plaintiff's RFC after considering "all symptoms

and the extent to which these symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence," in accordance with the regulations. (R. at 20.) The ALJ also

"fully considered the medical opinion(s) and prior administrative medical finding(s)" when

making her findings. (R. at 23.) Based on her RFC determination, the ALJ concluded at step four

that Plaintiff was capable of performing past relevant work as a chief of police and deputy sheriff

because "[t]his work does not require the performance of work-related activities precluded by

[Plaintiff's RFC]." (R. at 25.)

Because the ALJ found Plaintiff was able to perform his past relevant work, the ALJ was

not required to advance to step five of the sequential evaluation process. *See* 20 C.F.R. §

404.1560(b)(3). Nonetheless, the ALJ proceeded to make "alternative findings for step five of the

sequential evaluation process." (R. at 25.) In doing so, the ALJ considered the testimony of a

vocational expert, who testified that given Plaintiff's age, education, past relevant work

experience, specific vocational preparation, and RFC, Plaintiff could perform the requirements of

representative occupations such as "brewery/distillery worker," "hand packer," and "order

selector." (R. at 26.) Based on her findings at step four and alternative findings at step five of the sequential evaluation process, the ALJ concluded that Plaintiff was not disabled under the Act. (R. at 26.)

## IV. ANALYSIS

Plaintiff moves for a directed award of benefits or, in the alternative, remand. (Pl.'s Mem. Supp. Mot. Summ. J. at 1-2, 23, ECF. No. 21 ("Pl.'s Mem.").) Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ: (1) failed to consider an x-ray showing moderate multilevel facet arthritis; and (2) erroneously assessed Plaintiff's ability to frequently reach in all directions with his left arm. (Pl.'s Mem. at 1, 8, 11, 22-23.) Plaintiff also contends the ALJ failed to explain why she discredited Plaintiff's subjective complaints of pain. (Pl.'s Mem. at 13.) Lastly, Plaintiff claims the ALJ committed errors when she: (1) found Plaintiff's anxiety and depression to be non-severe; (2) improperly assessed mild limitations in two areas of mental functioning; (3) failed to "conduct the 'more detailed assessment' required by SSR 96-8p'"; and (4) failed to account for medical opinion evidence. (Pl.'s Mem. at 16-21.)

Defendant responds that the ALJ: (1) relied on substantial evidence in support of her RFC determination; (2) was not obligated to affirmatively address every piece of evidence in the record; and (3) adequately explained the reasoning for her assessed limitation of Plaintiff's left upper extremity. (Def.'s Mem. 13-14, 22-23.) Defendant adds that the ALJ appropriately assessed Plaintiff's complaints of his symptoms in accordance with the regulations and case law. (Def.'s Mem. 14-18.) Further, Defendant explains that the ALJ appropriately considered Plaintiff's mental health impairments and adequately explained her findings and that substantial evidence supports her findings. (Def.'s Mem. 18-22.)

For the reasons that follow, this Court finds that the ALJ applied the correct legal standards and her findings are supported by substantial evidence.

## A. The ALJ Did Not Err in her RFC Determination and Substantial Evidence Supports her Findings.

### 1. Plaintiff's Medical Treatment History.

On December 13, 2018, Plaintiff presented to the emergency department following a motor vehicle collision in which he sustained a forehead abrasion, chest contusion, and back and abdominal pain. (R. at 318.) On examination, he exhibited chest wall tenderness but no musculoskeletal tenderness or swelling. (R. at 320.) He was found to have normal range of motion, strength, and coordination, and was alert and oriented. (R. at 320.) Radiographic imaging of his head showed "no acute intracranial process." (R. at 320-21.) A CT exam of Plaintiff's cervical spine showed normal alignment and "no evidence of acute fracture or subluxation. The facets are in proper relationship bilaterally. The craniocervical and cervicothoracic junctions are normal." (R. at 321-22.) Plaintiff's "intervertebral disc spaces [were] of average width" and his "spinal canal diameter [was] normal." (R. at 322.) He also underwent a CT examination of his chest, which showed "[a]ortic arch and coronary artery calcifications" but "no hilar or mediastinal mass." (R. at 322-23.) The radiologist noted his impressions as "vascular calcification, thoracic spondylosis, [and] minimal infiltrate or atelectasis in the left lower lobe and lingula." (R. at 323.) Subsequently, Plaintiff was discharged with prescriptions for medications and told to follow up with his primary care provider if needed. (R. at 323.)

On January 14, 2019, Plaintiff attended an annual wellness visit with his primary care provider, Linda Powers, M.D. ("Dr. Powers"). (R. at 355.) He was accompanied by his wife, who told the doctor that her husband was "tired all of the time." (R. at 355.) Plaintiff reported a loss of appetite, increase in back pain, fatigue and exercise intolerance as a result of the motor vehicle

accident. (R. at 357.) He relayed his concerns that his blood pressure medication was causing fatigue, dizziness, back pain, and erectile dysfunction. (R. at 357.) On February 27, 2019, he followed up with his pain medicine specialist, Larry Winikur, M.D. ("Dr. Winikur"), complaining of pain "across the upper back between the scapular areas, as well as across the lower back." (R. at 379.) He reported that the pain was severe after the motor vehicle collision but was beginning to improve with medication. (R. at 379.) He described the pain as "sharp, stabbing, and aching," which increased "upon standing or walking for extended periods, going from sitting to standing, bending at the waist, and activity that require[d] him to push, pull or lift." (R. at 379.)

On examination, Plaintiff appeared alert and oriented with appropriate mood and affect, and in no apparent distress. (R. at 381.) He had a normal range of motion and full motor strength in his back, and right and left upper and lower extremities. (R. at 381-82.) His back was not tender and had normal lumbar lordosis. (R. at 382.) Plaintiff's mood and affect were noted to be "appropriate with no depression, anxiety, or agitation," and his recent and remote memory was focused and normal. (R. at 382.) His provider identified no gross sensory or motor deficits and he appeared oriented to person, place, and time. (R. at 382.)

On May 28, 2019, Plaintiff returned to Dr. Winikur. (R. at 385.) Plaintiff reported aching, dull, stabbing, and sharp pain in his mid to lower back that radiated to his right lower extremity and worsened with activity. (R. at 385.) He reported left shoulder pain that began two years before and was not sure if it was impacted by the motor vehicle accident. (R. at 385.) He assessed his level of pain of being 10/10 at its worst without medication and 4/10 with medication. (R. at 385.) Plaintiff's physical and mental examination findings remained unremarkable, and Dr. Winikur remarked that "he [was] doing well" and advised him to continue with his medications and to follow up in three months. (R. at 387-89.)

On August 27, 2019, Plaintiff presented again to Dr. Winikur and reported aching, throbbing, and intermittent sharp, shooting, and stabbing pains "with twisting or stepping wrong." (R. at 391.) He complained of a "radiating or squeezing sensation that start[ed] in his mid to lower lumbar region that radiates around underneath his ribcage" that increased with activity and "change of weather (cold & damp) . . . ." (R. at 391.) Plaintiff rated the severity of his pain without medication as 8/10 and 5/10 with medication and his physical and mental examination findings remained unremarkable, although his provider modified his pain medicine prescriptions due to their perceived tolerance. (R. at 391, 393-95.)

On November 21, 2019, Plaintiff followed up with Dr. Winikur again. (R. at 420.) Plaintiff reported aching, throbbing, and sharp pain in his lumbar spine that radiated to his right lower extremity that worsened with activity and changes in weather. (R. at 420.) He rated its severity as 2/10 with medication and 10/10 without it. (R. at 420.) Plaintiff reported that pain medication, resting, repositioning, and topic gel were effective measures in decreasing his pain and "allow[ed] him to stay active." (R. at 420.) Plaintiff's physical and mental examination findings remained unremarkable and he was strongly admonished not to take more opioid medication than prescribed. (R. at 424.)

On December 10, 2019, Plaintiff underwent an x-ray of the lumbar spine due to "shoulder and back problems, osteoarthritis[,]" and lower back pain radiating down his right leg. (R. at 399 ("the December 2019 x-ray").) The resultant findings showed "no fracture or spondylolisthesis." (R. at 399.) The report noted "small anterior osteophytes at all levels with the exception of L1-2." (R. at 399.) Further, it was noted there was: (1) "mild disc space height narrowing at L5-S1[;]" and (2) "multilevel facet arthritis regarded as moderate, most pronounced from L3 through S1." (R. at 399.)

On February 20, 2020, Dr. Winikur reviewed the December 2019 x-ray. (R. at 425.) At that time, Plaintiff told Dr. Winikur that he had been experiencing pain radiating to his lower right extremity with "intermittent tingling, burning, and stinging." (R. at 425-29.) Plaintiff reported weakness in his upper and lower extremities and not being able to sit or drive for more than fifteen minutes without having to stop and walk around. (R. at 425.) Physical examination revealed pain, weakness, and range of motion impairments associated with lumbar radiculopathy, but he exhibited normal gait, stability, strength, and range of motion in his neck and bilateral extremities. (R. at 427-28.) Dr. Winikur remarked that he had reviewed the December 2019 x-ray "which showed "extensive [degenerative joint disease] and [degenerative disc disease]." (R. at 429.) Dr. Winikur added that he did not see Plaintiff being viable or competitive in the employment market "[d]ue to his intractable pain" and "opioid dependence to control some of his pain[.]" (R. at 429.) Dr. Winikur stated that he "support[ed]" Plaintiff's "desire for Social Security Disability" and he advised Plaintiff to continue with his medications and follow-up in three months. (R. at 429.)

Treatment notes for subsequent visits to Dr. Winikur in May and August of 2020 continued to document Plaintiff's lumbar radiculopathy. (R. at 434, 439.) On May 13, 2020, Plaintiff reported that his pain medication only alleviated his symptoms for three to four hours, when his pain severity rated 3/10, but without medication can be rated 9/10. (R. at 430.) He continued to have normal physical and mental examination findings, with the exception that he had pain, weakness, and range of motion impairments in his back. (R. at 432-33.)

On June 5, 2020, Plaintiff reported back and shoulder pain during his annual visit with Dr. Powers and remarked that the chronic pain and inability to work as a result caused him to have anxiety and depression. (R. at 444-47.) Plaintiff's physical and mental examination was unremarkable, except for what Dr. Powers diagnosed as "[r]ecurrent major depressive episodes,

moderate." (R. at 448.) Dr. Powers noted that Plaintiff was experiencing "major life stressors" related to the chronic pain, adding that he "continue[d] to have some depression but relate[d] that he fe[lt] that it is improved on the duloxetine, testosterone and his current pain medications." (R. at 452.) Plaintiff told Dr. Powers that he felt comfortable sharing his feelings with his daughter, who accompanied him to his appointment, and that he had an upcoming appointment with a psychiatrist. (R. at 448.)

   *2. Legal Standard.*

   In making the RFC assessment, the ALJ must consider the functional limitations resulting from the claimant's medically determinable impairments. SSR 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184, at *2. The ALJ is not obliged, however, to precisely mirror any particular piece of evidence, or to discuss every piece of evidence in the record. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing 42 U.S.C. § 405(b)(1) and affirming an ALJ decision that contained a discussion of "the whole record," instead of a description of every piece of evidence in the record); *Felton-Miller v. Astrue*, 459 F. App'x 226, 230-31 (4th Cir. 2011) (explaining that an ALJ should base an individual's RFC on all available evidence); *Griffin v. Comm'r*, No. SAG-16-274, 2017 U.S. Dist. LEXIS 13039, 2017 WL 432678, at *3 (D. Md. Jan. 31, 2017) ("ALJ need not parrot a single medical opinion, or even assign 'great weight' to any opinions, in determining [the] RFC"). Rather, the ALJ must review and synthesize the record in its entirety and make findings about what the evidence shows. *See* 20 C.F.R. § 404.1520b ("After we review all of the evidence relevant to your claim we make findings about what the evidence shows.").

   Moreover, a reviewing court must read the ALJ's decision as a whole, meaning the decision should be affirmed even if the supporting discussion for a particular fact is found in a section of the decision covering some other aspect of the sequential review process. *Smith v. Astrue*, 457 F.

App'x 326, 328 (4th Cir. Dec. 14, 2011) (affirming ALJ decision on Listings, in part, because the rest of the ALJ's decision made clear the reasoning for the conclusion regarding the Listings); *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. May 2, 2018) (reading an ALJ decision as a whole and affirming based on the fact that the ALJ stated a coherent basis for conclusions).

### 3. The ALJ Did Not Err by Not Specifically Discussing the December 2019 X-Ray Imaging in Her Written Decision.

Plaintiff contends the ALJ erred by failing to discuss the December 2019 x-ray or make any mention "of the word 'arthritis' (such as osteoarthritis) in reference to [Plaintiff's] spine." (Pl.'s Mem. at 8.) In failing to do so, Plaintiff contends the ALJ overlooked "a highly material piece of objective evidence" that supports Plaintiff's pain allegations. (Pl.'s Mem. at 11-12.) Such error, Plaintiff argues, is not harmless because it "prevents the Court from conducting substantial evidence review" and "there is a substantial likelihood that the ALJ [would have] reached a different decision if she had considered [the December 2019 x-ray]." (Pl.'s Mem. at 12-13.)

A review of the ALJ's decision and the record shows that the ALJ sufficiently considered Plaintiff's back pain and treatment when she found that Plaintiff's degenerative disc disorder was a severe impairment. Although the ALJ did not make express reference to the December 2019 x-ray, there is substantial evidence in the record to support the ALJ's conclusions regarding Plaintiff's degenerative disc disease and back pain.

In her narrative discussion, the ALJ referenced numerous treatment notes from Dr. Winikur that listed "arthritis" in Plaintiff's medical history. (R. at 21, citing R. at 369, 379, 385, 391.) Among these was a June 2018 treatment note in which Plaintiff informed Dr. Winikur that Dr. Powers diagnosed him with arthritis. (R. at 21, citing R. at 369.) The ALJ also referenced a February 2020 visit when Dr. Winikur reviewed the December 2019 x-ray and concluded that Plaintiff had degenerative disc disease. (R. at 22, citing R. at 425-429.) The ALJ also noted that

Plaintiff's examinations in February, May, and August 2020 noted his "pain, weakness, and range of motion impairments in his back, with all other findings unchanged . . . ." (R. at 22.) The ALJ cited treatment notes documenting Plaintiff's assertion that his back pain was due to arthritis and that listed arthritis as part of his medical history. (R. at 21, citing R. at 369, 379, 385, 391.) The ALJ also discussed prior administrative opinions that mentioned: (1) the December 2019 x-ray; and (2) a finding of "moderate facet arthritis." (R. at 23, citing R. at 58-65, 67-73.)

The ALJ did not commit legal error by failing to opine directly on the December 2019 x-ray, which constitutes "objective medical evidence" and "other medical evidence" as set forth in 20 C.F.R. § 404.1513(a). Unlike medical opinions, such evidence does not trigger any articulative duty for an ALJ, and an ALJ may include or omit discussion of specific pieces of such evidence subject only to the extent that she satisfies the regulatory requirement that she generally provide an adequate narrative discussion. *See id.* § 404.1513; SSR 96-8p at *7. In other words, the ALJ was not required to mention the December 2019 x-ray, and its omission from her discussion does not indicate that she failed to consider it. Moreover, the ALJ's thorough discussion supports the contention that she considered the impact of Plaintiff's arthritis and back pain. In fact, the ALJ accounted for Plaintiff's arthritis and back pain in assessing Plaintiff's exertional limitations in the RFC after she considered all of Plaintiff's symptoms and the "extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . .." (R. at 20.) As a result, the ALJ did not err in failing to address the December 2019 x-ray, and Plaintiff's argument that the ALJ might have reached a different outcome had she specifically considered the December 2019 x-ray is unavailing.

   4. *Plaintiff's Left Shoulder Exertional Limitations.*

Plaintiff also contends that the ALJ failed "to provide a narrative discussion explaining her

finding that [Plaintiff] has an RFC to frequently reach in all directions with the left upper extremity despite having left shoulder impingement syndrome." (Pl.'s Mem. at 22.) In support, Plaintiff reasons that the ALJ's explanation is insufficient because it "is a negation" when the regulations require "an *affirmative* reason for finding that [Plaintiff] has this or that functional capacity." (Pl.'s Mem. at 23) (emphasis in original.) He adds that the ALJ's step-two analysis did "not affirmatively explain" why Plaintiff was limited to frequently reaching in all directions with his upper left extremity when his forward elevation is limited to 130 degrees and his abduction is limited to 90 degrees without pain. (Pl.'s Mem. at 23.) Defendant responds that the ALJ's finding is supported by substantial evidence because the medical records and medical opinion evidence failed to indicate the need for more restrictive limitations. (Def.'s Mem. at 22-23.)

a.   Plaintiff's Left Shoulder Impingement Syndrome.

On May 30, 2019, Plaintiff sought treatment at an orthopedist, Niraj Kalore, M.D. ("Dr. Kalore") for "chronic anterior left shoulder pain[.]" (R. at 305.) Dr. Kalore noted that Plaintiff: (1) claimed the pain had been ongoing for two years, with "insidious onset[;]" and (2) had reduced range of motion along multiple vectors; and (3) had a painful Hawkins Test, which tests shoulder impingement. (R. at 305; Pl.'s Mem. at 6, citing R. at 308.) Dr. Kalore diagnosed Plaintiff with "[l]eft shoulder impingement syndrome." (R. at 308.) Dr. Kalore noted that "[p]rimary osteoarthritis of the left acromioclavicular joint . . . may not be evident on x-rays." (R. at 308.) Dr. Kalore also suggested physical therapy but "[Plaintiff] does not want to do physical therapy[,]" though Plaintiff was given strengthening exercises. (R. at 309.) Dr. Kalore also noted that "with [Plaintiff's] exam findings and nontraumatic history," he did not feel that Plaintiff's shoulder impairment warranted an MRI. (R. at 309.)

On June 27, 2019, Dr. Powers noted Plaintiff's poor left shoulder range of motion. (R. at 348.) Dr. Powers was still annotating Plaintiff's "left shoulder pain" at visits approximately a year later, noting that Plaintiff was seeing Dr. Winikur for his shoulder pain. (R. at 447.) Plaintiff continued to complain of his shoulder pain in a function report on October 21, 2019. (R. at 192.) However, as late as August 12, 2020, Dr. Winikur assessed Plaintiff's "left upper extremity" as having "[p]ainless full [range of motion], motor strength 5/5, no gross abnormalities." (R. at 438.) In his musculoskeletal questionnaire of October 15, 2020, Dr. Winikur did not mention Plaintiff's shoulder pain or any manipulative limitations. (R. at 400-405.)

Based on this record, neither state medical consultant at the initial or reconsideration levels found any manipulative limitations related to Plaintiff's left shoulder impingement syndrome. (R. at 63, 71-72.) At Plaintiff's hearing with the ALJ, Plaintiff mentioned his shoulder problems, but noted that they had "gotten some better." (R. at 47.) Plaintiff further testified that his shoulder problems are "not as bad as it was when all this started." (R. at 47.)

        b.    <u>The ALJ's Assessed Limitations.</u>

At step two of the sequential evaluation process, the ALJ found that Plaintiff's left shoulder impingement syndrome was a severe impairment. (R. at 17.) In her RFC, the ALJ limited Plaintiff to "occasional [sic] climbing ladders, ropes, and scaffolds; frequently push/pull with the upper and lower extremities; frequently reaching in all directions with the left upper extremity . . .." (R. at 20.) In making her RFC determination, the ALJ summarized the medical findings supporting her assessed limitations. (R. at 22, citing R. at 305.) In doing so, she considered Plaintiff's course of treatment for his shoulder, which consisted of physical therapy and over-the-counter medications, and noted that his providers did not recommend nerve blocks or surgery. (R. at 22-23, citing R. at 309.) She acknowledged that Plaintiff's left upper extremity required some restrictions on activity

due to his history of "pain, weakness and range of motion" impairments. (R. at 24, citing R. at 429, 433, 438.) She also addressed the medical opinion evidence. (R. at 23-24.) Dr. Winikur submitted a musculoskeletal questionnaire, which failed to opine on Plaintiff's left shoulder restrictions. (R. at 24, citing R. 402-04.) She evaluated Dr. Winikur's own examination and treatment records, which indicated Plaintiff had "normal motor strength in all four extremities with painless range of motion." (R. at 21, citing R. at 391-395, 417-439.) The ALJ noted that Dr. Winikur documented 2+/4 strength in all four extremities, "which indicates [Plaintiff] is capable of lifting/carrying 50 pounds occasionally and 25 pounds frequently . . . frequently pushing/pulling with the upper and lower extremities and reaching with the left upper extremity[.]" (R. at 24.) Moreover, the ALJ compared these findings with Plaintiff's reported complaints, such as being "very weak . . . in his [upper extremity]" and being unable to lift "no more than 20 pounds." (R. at 24, referencing R. at 425.) Noting that Dr. Winikur "restricted [Plaintiff] to lifting no more than 20 pounds," the ALJ reasonably concluded that some level of restriction is warranted, but not to the extent Plaintiff suggests. (R. at 24.)

Additionally, the ALJ considered the state agency physicians' opinions that limited Plaintiff to "frequently pushing/pulling with the bilateral upper and lower extremities" and "lifting/carrying 50 pounds occasionally and 25 pounds frequently . . . .." (R. at 23-24.) The ALJ found these opinions to be "partially persuasive" because they were supported by and consistent with the medical evidence "regarding [Plaintiff's] ability to lift/carry . . . [and] push/pull with the upper and lower extremities." (R. at 24.) However, the ALJ discounted these opinions on the basis that "[o]ther medical records suggest additional limitations. [Plaintiff] having pain, weakness, and range of motion impairments during later examinations by the pain management specialist indicates the need for further limitations in overhead reaching with the left upper extremity." (R.

at 24.)

Thus, the ALJ sufficiently articulated why she limited Plaintiff to frequent overhead reaching with his upper left extremity and outlined the evidence that supported her findings. In doing so, the ALJ built a logical bridge from the evidence to her conclusion. Although Plaintiff may not agree with the ALJ's findings, the undersigned finds that the ALJ carefully considered the entire range of medical evidence and provided a sufficient narrative discussing her reasoning. *See Craig v. Chater*, 76 F.3d at 594-95; SSR 16-3p, 2016 SSR LEXIS 4 at *6, 2016 WL 1119029, at *2 (Mar. 16, 2016); *see also* SSR 96-8p, 1996 SSR LEXIS 5 at *13, 1996 WL 374184, at *5 (July 2, 1996) (The RFC "assessment must be based on all of the relevant evidence in the case record."). It is not this Court's function to: (1) conduct a blank slate review of the evidence; (2) undertake to reweigh conflicting evidence; (3) make credibility determinations; or (4) substitute its judgment for that of the Commissioner. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 2012); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Rather, "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court." *Smith*, 99 F.3d 635, 638 (4th Cir. 1996). When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Therefore, the undersigned concludes that the ALJ did not err in her RFC determination and substantial evidence supports her findings.

**B.  The ALJ Appropriately Considered Plaintiff's Subjective Complaints.**

Plaintiff also challenges the ALJ's consideration of Plaintiff's subjective complaints. Plaintiff argues that the ALJ erred in relying on the evidence of Plaintiff's normal gait during physical examinations as a basis for discrediting his subjective complaints of pain. (Pl.'s Mem. at 14.) Plaintiff also challenges the ALJ's characterization of his treatment as "conservative" and

claims the ALJ erroneously assessed his statements as "inconsistent." (Pl.'s Mem. at 15, citing R. at 23.) Defendant responds that substantial evidence supports the ALJ's findings. (Def.'s Mem. at 14.)

1. *Legal Standard.*

When evaluating a claimant's symptoms, an ALJ must follow a two-step evaluation process. SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *2 (Mar. 16, 2016); 20 C.F.R. § 404.1529. The ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms." 2016 SSR LEXIS 4 at *3, [WL] at *2. At this step, the ALJ considers whether objective medical evidence exists to support the conclusion that an impairment exists. *Id.*

Next, at step two, after finding a medically determinable impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ is not required to find objective medical evidence to find that a claimant is disabled because "symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." 2016 SSR LEXIS 4, at *11, 2016 WL 1119029, at *4. The claimant is not required to present objective evidence at this step. *Id*. In sum, the two-step process requires the ALJ to consider the entire case record, and she must "not disregard [a claimant's] statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Arakas v. Comm'r, Soc. Sec. Admin*, 983 F.3d 83, 95 (4th Cir. 2020) (alteration in original) (citations omitted). Finally, the ALJ's decision must: (1) contain specific reasons for the weight given to the individual's symptoms; and (2) be consistent with and supported by the evidence.

2016 SSR LEXIS 4, at *26, 2016 WL 1119029, at *9.

   2.  *Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Complaints.*

   At step one of the two-step process, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . .." (R. at 23.) The ALJ acknowledged Plaintiff's allegations of back and shoulder pain, but found that the "intensity, persistence, and limiting effects of his symptoms [] are inconsistent." (R. at 23.) The ALJ explained: "findings during physical examinations have been minimal. During examinations, [Plaintiff] was alert and oriented, lungs clear to auscultation, regular heart rate and rhythm, normal gait, normal sensory, and normal mood and affect." (R. at 23) (internal citations omitted.) Plaintiff argues that "having a normal gait does not refute his allegations of pain in his back and left shoulder." (Pl.'s Mem. at 13.) Plaintiff concedes that "this Court has not assented to the foregoing proposition." (Pl.'s Mem. at 14.) Consequently, Plaintiff relies on authority outside the Fourth Circuit to support his contention that the "ALJ's citation to normal gait is insufficient" because she should have explained "how a claimant's normal gait impeaches his pain allegations . . .." (Pl.'s Mem. at 13-14.)

   A review of the evidence and the ALJ's decision shows that it was reasonable for the ALJ to consider the objective medical findings documenting a normal gait when assessing the credibility of Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms. In her decision, the ALJ sufficiently articulated her findings, thereby drawing a logical bridge from the evidence to her conclusion. For instance, the ALJ pointed out how Plaintiff claimed that walking, bending, stooping, and twisting causes pain. (R. at 21.) Specifically, the ALJ

discussed Plaintiff's testimony about how he walked to his mailbox approximately two hundred yards away but was "winded" by the effort. (R. at 21, citing R. at 45.) Based on Plaintiff's statements to the ALJ about his inability to walk without pain and shortness of breath, it was reasonable for the ALJ to include in her credibility assessment the objective evidence documenting that Plaintiff had: (1) clear lungs; (2) a regular heart rate; (3) a regular heart rhythm; and (4) a normal gait. (R. at 23.) Reading the decision as a whole, the ALJ also noted that Plaintiff's providers found that he exhibited full strength in his arms and legs, was noted on multiple occasions to have "painless range of motion" of his back, and consistently demonstrated excellent coordination. (R. at 21-22, 381-82, 387-88, 393-94, 428, 433, 438.) As result, the undersigned concludes that substantial evidence supports the ALJ's assessment of Plaintiff's subjective complaints.

### 3. The ALJ's Characterization of Plaintiff's Treatment as Conservative.

Next, Plaintiff argues that the ALJ erroneously concluded that his treatment was "routine, conservative, and unremarkable." (Pl.'s Mem. at 15, citing R. at 23.) Because he was taking opioids daily, Plaintiff argues that his treatment should have been considered "'aggressive,' or at least not 'conservative[.]'" (Pl.'s Mem at 15.) Plaintiff offers no case law from courts within the Fourth Circuit to support the notion that his treatment cannot be considered "conservative" due to his opioid pain medication use. (Pl.'s Mem. at 15.)

In response, Defendant identified court decisions within the Fourth Circuit that considered whether a claimant's use of prescribed opioids constituted a non-conservative course of treatment. (Def.'s Mem. at 16-17) (citing *Vest v. Colvin*, No. 5:13-CV-00067, 2014 WL 4656207, at *2 n.1 (W.D. Va. 2014) ("Several courts have found treatment through prescription narcotics and pain injections to be conservative."); *Hoffman v. Kijakazi*, No. 2:20-CV-00696, 2021 WL 5138175, at

*9-10 (S.D.W. Va. 2021), report and recommendation adopted, No. 2:20-CV-00696, 2021 WL 5139513 (S.D.W. Va. Nov. 2, 2021) (finding that the ALJ did not violate the Fourth Circuit's precedent by describing claimant's medical treatment as conservative even though he was "prescribed high-dose opioids.")). According to Defendant, the ALJ appropriately assessed the "entire course of treatment" and determined, based on the entirety of the record, that Plaintiff's statements were not consistent with the medical evidence. (Def.'s Mem. at 17-18) (citing *Hoffman v. Kijakazi*, No. 2:20-CV-00696, 2021 WL 5139513 (S.D.W. Va. 2021).

Although there is no regulatory definition of "conservative" medical treatment, it is often considered treatment less invasive than surgery. *Guy M. v. Saul*, No. 3:19-CV-00071, 2021 U.S. Dist. LEXIS 51912, 2021 WL 805527, at *7 n.8 (W.D. Va. Mar. 2, 2021), *report and recommendation adopted sub nom. Merritt v. Saul*, 2021 U.S. Dist. LEXIS 51232, 2021 WL 1082488 (W.D. Va. Mar. 18, 2021) (collecting cases). The Fourth Circuit has found that an ALJ improperly concluded that a claimant's treatment was conservative when procedures such as nerve blocks and ablation preceded surgical intervention. *See, e.g., Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) ("[The claimant's] multiple medical conditions require her to take powerful analgesics, including Fentanyl and Oxycodone. Furthermore, [the claimant] endured multiple surgeries, one of which required removal of her first left rib to alleviate pain. Before those surgeries, [the claimant] underwent a lumbar epidural injection, two supraspinatus nerve blocks, and a radiofrequency ablation of her supraspinatus nerve. In light of the extensive treatment [the claimant] received for her various conditions, the ALJ's designation of [the claimant's] course of treatment as 'conservative' amounts to improperly 'playing doctor' in contravention of the requirements of applicable regulations.").

22

However, the ALJ in this case did not violate the Fourth Circuit's precedent by describing Plaintiff's medical treatment as conservative, and a review of the record indicates that Plaintiff's treatment can be fairly labeled as such. The ALJ noted that Plaintiff attended routine medical appointments with his primary care provider and pain management specialist, who both documented Plaintiff's use of pain medication. (R. at 21, 23.) Nonetheless, Plaintiff did not attend physical therapy as suggested by his orthopedist. (R. at 23.) Plaintiff's primary care provider encouraged him to be physically active to counter his "sedentary lifestyle" and his pain management specialist declined to recommend nerve blocks, physical therapy, a TENS unit, or surgery. (R. at 23) (citations omitted.) There is no evidence that Plaintiff's treatment program required any inpatient hospitalization or surgical interventions for his conditions during the relevant period.

Therefore, although Plaintiff might disagree that he was treated conservatively, the ALJ did not commit legal error in making that finding. *See, e.g., Jason*, 2020 U.S. Dist. LEXIS 170609, 2020 WL 5578969, at *8 (citing that epidural injections, medication, physical therapy, and radiofrequency ablation were determined to be conservative treatment); *Cf. Guy M. v. Saul*, No. 3:19-CV-00071, 2021 U.S. Dist. LEXIS 51912, 2021 WL 805527, at *7 n.8 (W.D. Va. Mar. 2, 2021), *report and recommendation adopted sub nom. Merritt v. Saul*, 2021 U.S. Dist. LEXIS 51232, 2021 WL 1082488 (W.D. Va. Mar. 18, 2021) (finding that the ALJ's characterization of treatment, which included two back surgeries and a total hip replacement, as "routine, conservative, and unremarkable" was erroneous). Thus, substantial evidence supports the ALJ's characterization of Plaintiff's treatment as "conservative."

4. *The ALJ's Evaluation of Plaintiff's Allegedly Inconsistent Statements.*

Plaintiff also disputes the ALJ's finding that Plaintiff "provided inconsistent statements

regarding his limitations." (Pl.'s Mem. at 15, citing R. at 23.) Plaintiff avers that the ALJ's statement is "false" because she failed to "point out inconsistencies in [Plaintiff]'s *statements*, but rather attempted to show an inconsistency between [Plaintiff]'s allegations of limitations in walking, standing, and lifting, on the one hand, and 'the degree of activity encouraged by his primary care provider,' on the other." (Pl.'s Mem. at 15-16) (emphasis in original.) According to Plaintiff, "[t]his supposed 'inconsistency' proves nothing.'" (Pl.'s Mem. at 16.)

In her decision, the ALJ noted that Plaintiff "provided inconsistent statements regarding his limitations." (R. at 23.) Specifically, the ALJ referenced Plaintiff's testimony that he was limited in walking, standing, and lifting. (R. at 23.) She reasoned that his primary care provider encouraged him to be more physically active, noting that he did not exercise on a regular basis and was "deconditioned due to his sedentary lifestyle." (R. at 23) (internal citations omitted.) Thus, the ALJ pointed to the inconsistency between what Plaintiff claimed he was unable to do and what his providers encouraged him to do. (R. at 23.) Contrary to Plaintiff's contention that the ALJ based her credibility findings on Plaintiff's noncompliance, the ALJ permissibly noted that Plaintiff's subjective claims that he could not walk for long distances were inconsistent with what his doctor advised him to do. (Pl.'s Mem. at 16.) Although Plaintiff may disagree with the ALJ's finding that he provided inconsistent statements regarding his limitations, the ALJ did not commit legal error in making this finding.

## C.  The ALJ Did Not Err When Evaluating Plaintiff's Depression and Anxiety.

Plaintiff argues the ALJ committed multiple errors when evaluating Plaintiff's depression and anxiety. Plaintiff contends the ALJ erred by failing to "evaluate the persuasiveness of medical opinions that [his] Major Depressive Disorder was moderate . . .." (Pl.'s Mem. at 16.) Plaintiff also argues the ALJ erred when she found his depression and anxiety to be non-severe. As part of this argument, Plaintiff contends the ALJ erroneously failed "to account for Plaintiff's limitations in

24

concentration, persistence and pace and limitations in social functioning." (Pl.'s Mem. at 16.) Plaintiff next argues the ALJ failed to provide a "more detailed assessment" of her findings in accordance with SSR 96-8p. (Pl.'s Mem. at 21.) Lastly, Plaintiff contends the ALJ failed "to evaluate the persuasiveness" of the medical opinions. Defendant responds that the ALJ adequately evaluated Plaintiff's depression and anxiety in accordance with the regulations, and substantial evidence supports the ALJ's findings. (Def.'s Mem. at 18.)

### 1. *Plaintiff's Mental Health Treatment.*

Plaintiff reported anxiety and depression to his primary care physician, Dr. Powers, at various appointments. (R. at 347, 351-52, 448, 452.) Treatment notes from these visits consistently documented Plaintiff as cooperative, friendly, oriented to person, place, time, and purpose. (R. at 348, 358, 362, 448, 452.) Dr. Powers referred Plaintiff to a psychiatrist on March 25, 2019, noting her belief that "counselling would assist w[ith] his treatment of his anxiety to hopefully be able to reduce or [discontinue] the [medication] that might be sedating." (R. at 352.) In her referral, Dr. Powers advised that Plaintiff should be evaluated "for anxiety and depression – moderate – has failed attempts at management with SSRI . . . ." (R. at 352.) On June 27, 2019, Plaintiff followed up with Dr. Powers and reported feeling depressed. (R. at 347-78.) At that time, Plaintiff had not yet seen a psychologist or therapist despite being "referred to several providers" but was "very interested" in virtual psychiatry services (R. at 347-48.) Plaintiff denied suicidal ideations and affirmed that he was able to maintain relationships, noting that he had good family and social support. (R. at 347.) Dr. Powers deemed Plaintiff's prognosis "moderate" and told him to "work on [a] healthy diet and exercise to help [his] blood pressure and [his] depression and anxiety." (R. at 347, 349.)

On October 11, 2019, Plaintiff again reported chronic pain-related depression to Dr. Powers, who remarked that Plaintiff felt improved before. (R. at 449-452.) Dr. Powers added that Plaintiff "continue[d] to have some depression but relate[d] that he fe[lt] that it [was] improved" with medications. (R. at 452.) Plaintiff did not make an appointment with a psychiatrist due to transportation difficulties. (R. at 453.) On June 5, 2020, Plaintiff followed up with Dr. Powers again. (R. at 444.) At that time, Dr. Powers noted that Plaintiff had been experiencing "[r]ecurrent major depressive episodes, moderate." (R. at 445.) Dr. Powers noted that Plaintiff was seeking psychiatric care but was having problems arranging transportation. (R. at 446.) Plaintiff told Dr. Powers that he had not yet seen a psychologist or therapist, but experienced "difficulty with transportation." (R. at 446.) Plaintiff reported "major life stressors (related to chronic pain and inability to work)" but denied suicidal ideations, visual/auditory hallucinations, delusions, and crying spells. (R. at 446-47.) His appetite was appropriate and reported having a healthy diet most of the time (R. at 447.) Plaintiff admitted that he did not exercise on a regular basis, lived a sedentary lifestyle, and had difficulty sleeping. (R. at 447.) Although Plaintiff reported anhedonia and pessimism, he continued to be "able to maintain relationships," had "close support from his family," and enjoyed spending time with his grandson. (R. at 447-48.) Dr. Powers remarked that Plaintiff had an "upcoming appointment with psychiatrist" and advised him to exercise, eat a healthy diet, and to follow up in six months. (R. at 448-49.)

On June 19, 2020, Plaintiff attended a telehealth psychiatric appointment with Matthew Petrilli, M.D. ("Dr. Petrilli") (R. at 408.) Dr. Petrilli noted Plaintiff's daily anxiety, worrying thoughts that interfered with sleep, panic attacks, irritability, short temper, social isolation, depressed mood, anhedonia, and paranoia. (R. at 408.) Dr. Petrilli assessed Plaintiff as having "[m]ixed anxiety and depressive disorder" and remarked that Plaintiff "would benefit from

outpatient psychotherapy," which Plaintiff declined. (R. at 409.) According to Dr. Petrilli, Plaintiff was at "[n]o acute psychiatric risk" and did not require a "higher level of psychiatric care" at that time. (R. at 409.) On July 31, 2020, Plaintiff visited Dr. Petrilli again and reported a "positive response" since his prior visit. (R. at 411.) Dr. Petrilli agreed that Plaintiff's "symptoms of depression and anxiety moderately improved since last visit." (R. at 412.)

      2.  *Legal Standard.*

The regulations require the use a "special technique" for evaluating the severity of mental impairments at each level of the administrative review process. 20 C.F.R. 404.1520a(a). If the ALJ determines the claimant has a medically-determinable mental impairment, she "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [her] findings." 20 C.F.R. § 404.1520a(b)(1). The ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" in the areas of: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 404.1520a(b)(2).

If the ALJ assesses a degree of limitation that is consistent with severe mental impairment, but that neither meets nor is equivalent in severity to a listing, she must account for the mental impairment in determining the claimant's RFC. 20 C.F.R. § 404.1520a(d). The ALJ's decision should "show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)" and "must include a specific finding as to the degree of functional limitation in each of the functional areas." 20 C.F.R. § 404.1520a(e)(4).

      3.  *The ALJ's Evaluation of Plaintiff's Mental Health Impairments.*

In this case, the ALJ applied the "special technique" for evaluating the severity of mental

impairments and assessed Plaintiff as having a mild limitation in interacting with others and in concentration, persistence, or pace. (R. at 18-19.)

Plaintiff first argues that the ALJ's "findings as to the 'paragraph B' criteria of 'interacting with others' and 'concentrating, persisting or maintaining pace' are clearly erroneous and not supported by substantial evidence." (Pl.'s Mem. at 17.) Specifically, Plaintiff claims that the ALJ's findings in Plaintiff's ability to interact with others was in error because the ALJ "did not consider" evidence from medical appointments that occurred after Plaintiff submitted his adult function report. (Pl.'s Mem. at 18.) In that adult function report, dated October 21, 2019, Plaintiff reported that he did not have "any problems getting along with family, friends, neighbors, or others." (R. at 201.) He also reported that he avoided crowds due to the noise. (R. at 201.) In September 2020, Plaintiff told Dr. Petrilli that he continued to avoid crowds. (R. at 414.) Plaintiff argues that this evidence, in addition to his diagnosed moderate major depressive disorder, "completely undermines the ALJ's finding that [Plaintiff] 'does not have any problems getting along with . . . others,' as well as her finding that [Plaintiff] has only a mild limitation in interacting with others." (Pl.'s Mem. at 18.)

A review of the decision demonstrates that the ALJ considered the entire medical record, including the medical treatment notes from Dr. Petrilli, as well as Plaintiff's submitted statements that he did not have difficulty getting along with others. (R. at 18, citing R. at 201.) Based on this evidence, it was reasonable for the ALJ to find that Plaintiff was mildly limited in his ability to interact with others. Contrary to Plaintiff's assertion that the ALJ "did not consider" Dr. Petrilli's September 2020 examination, the ALJ specifically cited and summarized these notes in her decision. (Pl.'s Mem. at 18) (R. at 22.) Indeed, the ALJ reviewed Dr. Petrilli's objective findings, noted that Plaintiff "was assessed with mixed anxiety and depressive disorder," and summarized

28

his medication changes. (R. at 22, citing R. at 415.) Plaintiff also argues that the ALJ did not consider "Dr. Powers' notes showing that [Plaintiff] had increased his alprazolam intake because of generalized anxiety and panic." (Pl.'s Mem. at 18, citing R. at 352.) However, the ALJ cited directly to Dr. Powers's treatment notes in her written decision. (*See* R. at 21 (citing to R. at 352) ("The claimant was assessed with anxiety disorder . . . .")); R. at 22 (citing to R. at 352 ("[Plaintiff] "was assessed with . . . moderate recurrent major depression")).) Insofar as Plaintiff objects that the ALJ erred because she "failed to consider material evidence favorable to [Plaintiff]", he is expressly asking the reviewing court to "reweigh" the evidence, which it is not permitted to do. (Pl.'s Mem. at 19) (emphasis added); *See Craig v. Chater*, 76 F.3d at 585, 589 (4th Cir. 1996).

Likewise, it was not error for the ALJ to consider Plaintiff's October 2019 statements when she found that he had a mild limitation in concentration, persistence, or pace. (Pl.'s Mem. at 19.) In support of her finding, the ALJ noted that providers consistently found Plaintiff to be cognitively alert and oriented with linear and goal-direct thought processes. (R. at 19.) The ALJ also cited to Plaintiff's adult function report, in which he stated that "his ability to pay attention depend[ed] on the circumstances, and that he [did] not tend to finish what he start[ed]." (R. at 19.) Plaintiff argues that the ALJ should have found that he had a moderate limitation in this functional area because "an ability to pay attention that 'depends on the circumstances' is no better than 'fair.'" (Pl.'s Mem. at 19-20.) In her narrative explanation for her findings in concentration, persistence or pace, the ALJ summarized objective examination findings from healthcare encounters, cited Plaintiff's statements in his function report, and referred to medical opinion evidence. (R. at 18-19.)

Plaintiff acknowledges the ALJ's articulation of the objective findings but argues that "having intact cognition and orientation does not appear to negate an assertion that [Plaintiff] has a moderate limitation in ability to stay on task." (Pl.'s Mem. at 20.) Here again, the Court must

decline Plaintiff's invitation to reweigh conflicting evidence, make credibility determinations, [and] substitute [its] judgment for that of the [ALJ]." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Rather, the undersigned finds there is substantial evidence to support the ALJ's findings that Plaintiff had a mild limitation in these functional areas. As a result, the ALJ did not err in finding Plaintiff's anxiety and depression to be non-severe.

### 4. The Duty to Provide a "More Detailed Assessment" as Required by SSR 96-8p.

Plaintiff argues that the ALJ failed to provide "a more detailed assessment" when assessing Plaintiff's mental RFC. (Pl.'s Mem. at 21.) Defendant responds that the ALJ "assessed all of the relevant treatment and opinion evidence relating to [Plaintiff]'s mental functionality, and the Court can conduct a meaningful review." (Def.'s Mem. at 21-22.)

As stated above, the limitations identified in the paragraph B criteria, are used only to rate the severity of mental impairments at step two and three and are not part of the RFC assessment. *See* SSR 96-8p, 1996 SSR LEXIS 5. The mental RFC assessment requires a more detailed assessment of various functions contained in the broad categories identified by paragraph B. Furthermore, in assessing the RFC, the ALJ must consider all of the limitations and restrictions imposed by a claimant's impairments, even if such impairments were not found to be severe at step two. *See id.*; 20 C.F.R. § 416.945(e).

Remand, however, is not necessarily required in every case where the ALJ fails to conduct an explicit function-by-function analysis. As the Fourth Circuit stated in *Mascio v. Colvin*, a per se rule requiring remand would be inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" 780 F.3d at 636 (citation omitted). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other

inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (citation and internal quotation marks omitted). "For this reason, the treatment of functional limitations arising from minor, mild mental health restrictions need not be as extensive and detailed as the treatment required regarding moderate restrictions. *Mascio* requires only that they be addressed adequately." *Helms v. Berryhill*, No. 5:16-cv-00229-MR-DLH, 2018 U.S. Dist. LEXIS 48929, 2018 WL 1472489, at *6 (W.D.N.C. Mar. 26, 2018) (Reidinger, J.).

Here, after conducting her analysis, the ALJ concluded Plaintiff's mental impairments were not severe and that they imposed at most minimal limitations on Plaintiff's ability to work. (R. at 19.) The ALJ recognized, however, that this severity determination was not an RFC assessment and noted that "the following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (R. at 19.) Subsequently, in the narrative discussion supporting her RFC assessment, the ALJ summarized portions of Plaintiff's record, including the testimony from Plaintiff's hearing and treatment notes from Dr. Petrilli. (R. at 21, 22, discussing R. at 43-48, 406-416.) The ALJ noted that Plaintiff stated he had no problems getting along with family, friends, neighbors, or others, and appeared upon examination to be "friendly, cooperative, with appropriate mood and affect." (R. at 18-19) (internal citations omitted.) Additionally, the ALJ explained that Plaintiff was noted by examiners to be alert and oriented, with "linear and goal-directed thought processes." (R. at 19) (internal citations omitted.)

Further, the ALJ discussed the opinions of the state agency psychological consultant, who opined that Plaintiff had no limitation in any of the four mental functioning areas. (R. at 24.) The ALJ concluded that this opinion was persuasive because it was "consistent with and supported by the medical evidence of record that reflects normal mental findings during examinations and mental status examinations." (R. at 24.) To the extent that Plaintiff argues that the ALJ should not

31

have relied on the state agency psychologist's opinions because they did not account for Plaintiff's treatment with Dr. Petrilli, the Court, once again, declines to re-weigh the evidence or substitute its judgment for that of the ALJ.

Thus, the ALJ did not fail to provide an adequate explanation for her assessment of Plaintiff's mild limitations in interacting with others and maintaining concentration, persistence or pace. To the contrary, the ALJ sufficiently referenced the evidence, including Plaintiff's submitted statements, testimony, and treatment notes, and provided substantial detail and explanation regarding these limitations. The Court concludes that the ALJ's treatment of Plaintiff's mild mental health impairments was adequate to satisfy *Mascio*. The ALJ's analysis was thorough and allowed for meaningful review. Therefore, the ALJ did not err.

### 5. *Medical Opinion Evidence.*

Plaintiff briefly alleges that the ALJ failed to "evaluate Dr. [Powers]'s or Dr. Petrilli's opinions" that [Plaintiff]'s major depressive disorder was "moderate, not mild." (Pl.'s Mem. at 19, citing R. at 348.) In support, Plaintiff cites to a treatment note from Dr. Powers during a visit on June 27, 2019, in which Dr. Powers assessed Plaintiff with moderate major depressive disorder. (R. at Pl.'s Mem. at 18 n.8, citing R. at 348-49.) He argues the ALJ erred by failing to articulate the "persuasiveness" of Dr. Powers's "opinion." (Pl.'s Mem. at 18 n.8, 19.)

The regulations explain what qualifies as a "medical opinion" for purposes of the ALJ's decision. A "medical opinion" is a "statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in his or her ability to perform work or adapt to environmental conditions. § 404.1513(a)(2). A medical opinion does not include "judgments about the nature and severity of [the claimant's] impairments, . . . medical history, clinical findings,

diagnosis, treatment prescribed with response, or prognosis." § 404.1513(a)(3). The regulations put such evidence in the category of "other medical evidence" as opposed to "medical opinion." *Id.* While the regulations impose articulative duties pertaining to medical opinions on the ALJ, they do not impose such duties with respect to other medical evidence. *See* §§ 404.1513(a), 404.1520c.

Here, the "medical opinion" identified by Plaintiff is not a "medical opinion" as defined in the regulations. Rather, it constitutes "other medical evidence" because it is a diagnosis and recorded judgment about the nature and severity of Plaintiff's depression. § 404.1513(a)(3). "Other medical evidence" does not prompt any articulative duties for the ALJ. *See* § 404.1513(a)(3). Accordingly, the Court finds that the ALJ did not err in declining to "evaluate the persuasiveness" of Dr. Powers's documentation of Plaintiff's major depressive disorder as "moderate" because it was not a medical opinion within the meaning of the regulations. Therefore, it did not trigger any articulative duty on the part of the ALJ.

### V. CONCLUSION

For the reasons set forth above, this Court recommends that Plaintiff's Motion for Summary Judgment and Motion to Remand (ECF No. 20) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 22) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge M. Hannah Lauck and to all counsel of record.

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

 

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: August 8, 2022

34